UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA,   \* CRIMINAL NO. 7:11-CR-00002
                            \* MARCH 1, 2012  10:31 A.M.
            Plaintiff,      \* SENTENCING
                            \* VOLUME I OF I
vs.                         \*
                            \*
SPENCER CRUISE MUMPOWER,    \* Before:
                            \* HONORABLE JAMES C. TURK
            Defendant.      \* UNITED STATES DISTRICT JUDGE
\* \* \* \* \* \* \* \* \* \* \* \* \* \* WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:        R. ANDREW BASSFORD, ESQUIRE
                          U.S. Attorney's Office
                          P.O. Box 1709
                          Roanoke, VA 24008


For the Defendant:        ANTHONY ANDERSON, ESQUIRE
                          P.O. Box 1525
                          Roanoke, VA 24007




Court Reporter:           Judy K. Webb, RPR
                          P.O. Box 1234
                          Roanoke, Virginia 24006
                          (540)857-5100 Ext. 5333


        Proceedings recorded by mechanical stenography,
transcript produced by computer.

U.S.A. v. Mumpower – 3/1/2012

1                    I N D E X

                                              Further
2              Direct  Cross  Redirect  Recross  Redirect

3  WITNESSES FOR THE
     DEFENDANT:
4  Michael Fosbre        4

5  Kevin Thompson       13

6  Ginger Mumpower      15

7  Spencer Mumpower     19

8

9

10 WITNESSES FOR THE
     GOVERNMENT:
11 Robin Roth           26

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S.A. v. Mumpower – 3/1/2012

1      (Court convened at 10:31 a.m.)

2          THE COURT:  Good morning, everyone.

3      The clerk will please call the first case.

4          THE CLERK:  United States of America v. Spencer

5  Cruise Mumpower, Criminal Action Number 7:11-CR-2, Defendant

6  Number 2.

7          THE COURT:  This case had been set for sentencing at

8  this time.

9      Is the United States ready to proceed?

10         MR. BASSFORD:  Yes, Your Honor.

11         THE COURT:  Mr. Mumpower ready to proceed?

12         MR. ANDERSON:  He is ready to proceed, Your Honor.

13         THE COURT:  There has been a presentencing report

14  prepared on Mr. Mumpower, copies have been furnished to the

15  U.S. attorney and to defense counsel.

16     Does the government have any objection to the

17  presentencing report?

18         MR. BASSFORD:  No, Your Honor.

19         THE COURT:  Let me ask defense counsel:  Have you and

20  Mr. Mumpower each had an opportunity to read the report, have

21  you discussed it between yourselves?

22         MR. ANDERSON:  Your Honor, we have read it, and we've

23  discussed it among ourselves, and I have reviewed it with

24  Mr. Mumpower.

25         THE COURT:  Are there any objections?

Michael Fosbre – Direct

1          MR. ANDERSON:  We have no objections, Your Honor.

2          THE COURT:  Is there any evidence either side wants

3   to put on relating to sentencing?

4          MR. ANDERSON:  Yes, if it please the Court, Your

5   Honor, the defendant will.

6          THE COURT:  Does the government have any evidence it

7   would like to put on?

8          MR. BASSFORD:  We do.  We would like to hold the

9   evidence for rebuttal, Your Honor.

10         THE COURT:  All right.  Would the defendant call its

11  first witness.

12         MR. ANDERSON:  Your Honor, if I may, I call Michael

13  Fosbre, please.

14         THE COURT:  All right.

15          MICHAEL FOSBRE, DEFENDANT'S WITNESS, SWORN

16                      DIRECT EXAMINATION

17  BY MR. ANDERSON:

18  Q    Good morning, Mr. Fosbre.  Would you please identify

19  yourself for Judge Turk.

20  A    Yes, sir.  My name is Michael Fosbre.  I'm a senior

21  probation/parole officer in the drug court program for the

22  State of Virginia.

23         THE COURT:  How do you spell your last name?

24         THE WITNESS:  F-O-S-B-R-E.

25  BY MR. ANDERSON:

Michael Fosbre – Direct

1   Q     And before you became the czar of the local drug court

2   here in the 23rd Judicial Circuit for the State of Virginia,

3   did you serve as a state probation officer?

4   A     Yes, sir.

5   Q     And how long did you serve in that capacity?

6   A     Prior to coming to drug court -- I came to drug court in

7   1995.  Prior to that, I started as probation/parole officer in

8   the state of Virginia in 1981.  And prior to that, I was a

9   probation/parole officer in the State of New Jersey for

10  approximately five and a half years.

11  Q     Now, since your involvement from 1995 with the Roanoke

12  Valley 23rd Judicial Drug Court Program -- have you been there

13  since its inception?

14  A     Yes, sir.

15  Q     And it was started and has essentially become a national

16  footprint for drug courts across the country, hasn't it?

17  A     The original drug court began in Dade County, I believe,

18  in Florida.  But we were the first drug court in the state of

19  Virginia.

20  Q     And Judge Strickland was instrumental in having that put

21  into place within the Commonwealth?

22  A     Yes, sir, that's correct.

23  Q     Now, if you would, could you give Judge Turk an idea of

24  how the drug court -- what the state drug court program is

25  like and what its regimen requires.

Michael Fosbre – Direct

1   A    Yes, sir.  The drug court in Roanoke, Virginia, is a

2   program for substance abusing, substance addicted individuals.

3   The first phase of the program is daily reporting, at which

4   time you are assessed by our service providers.  Our service

5   providers are Blue Ridge Behavioral Health Care and Family

6   Services of the Roanoke Valley.

7        You will be assessed for your needs, usually placed in

8   intensive outpatient class, which meets three days a week.

9   Everyone in the program has various responsibilities,

10  including curfew, court costs, treatment fees, supervision

11  fee, 100 hours community service.  You have to attend three

12  12-step meetings each and every week until you graduate.

13       The program is a minimum of 12 months, although many

14  people, due to the struggles that they may encounter in the

15  program, often are in the program longer than the 12-month

16  period.  But everybody who gets out has to earn their way out.

17  Q    And are the participants required, as part of a condition

18  of entering into a drug court program, to waive their right to

19  counsel and allowed to have ex parte proceedings with you and

20  the court?

21  A    Yes, sir.

22  Q    And people who have bumps along the way can be

23  disciplined by anywhere from a weekend in jail up to many

24  months in jail until they are ready to complete your program?

25  A    That's correct, sir.

Michael Fosbre – Direct

1  Q    Now, let me ask you about Spencer Mumpower.  Did there

2  come a time when you met Spencer Mumpower through the drug

3  court program?

4  A    Yes, sir.

5  Q    When was the first meeting you had with him, Mr. Fosbre?

6  A    Our office first came into contact with him -- he has

7  been in the program on two separate occasions.

8  Q    Yes.

9  A    Which is rather unusual for our program.

10       But he first came in the program May of 2008.  He was

11  supervised -- we supervise -- although you're assigned to an

12  individual probation officer, we do work as a team, so

13  everybody in the program often has contact with you.  But his

14  case was supervised for the most part by Mr. Brent Duncan.

15       I've had many contacts with Mr. Mumpower.  His first

16  stint in drug court, he did not do well.  He was still in the

17  throes of his addiction, and he ended up being removed from

18  the program.

19  Q    Now, as part of when a person goes in that program, are

20  they -- if they're not doing well, it's just not suited, or

21  they think it's not suited for them, can they opt out and go

22  back and take their underlying conviction and punishment from

23  what sent them to drug court?

24  A    Yes, sir.

25  Q    And Mr. Mumpower's first association with the program, is

Michael Fosbre - Direct

1   that what he did?

2   A     Yes, sir.

3   Q     Now, he continued in his addiction after that, and there

4   came a second time when he was referred to the drug court?

5   A     That is correct.

6   Q     And that would have been in 2010?

7   A     That was --

8   Q     2011?

9   A     We received him in February 2011.

10  Q     And he was there after receiving two five-year sentences;

11  and as a condition of probation of those five-year sentences,

12  he was to successfully enroll and complete the drug court

13  program?

14  A     That's correct.

15  Q     And that's the placement that you have had him under your

16  supervision?

17  A     Yes, sir.

18  Q     And tell the judge, if you would, how Mr. Mumpower has

19  performed with this second chance, if you will, with drug

20  court.

21  A     When Mr. Mumpower, as I stated, came in the program

22  February 2011.  Early on in the program he did struggle, not

23  like he had in the past, but he had -- he just was not

24  performing up to par.  He at one time gave us a dilute urine

25  screen, and he did not hand in some paperwork like he was

 1   supposed to.  Most of it was behavioral issues, not the drug

 2   usage issues.

 3   Q    Right.

 4   A    He received a week in jail on May 27th.  And after that,

 5   there was an incident with the community service site where

 6   the coordinator of the site felt that he might have been

 7   disrespectful towards her, and he was terminated.  And when he

 8   came to drug court reporting on the 16th of June 2011, he was

 9   removed from the drug court program by Judge Dorsey.

10        And he petitioned to get back in the program and was

11   placed back in the program after spending -- in August, it was

12   after spending somewhat of a month and a half incarcerated.

13        Since he came out in August, he's done everything to the

14   letter.

15   Q    Now, in terms of the community service site, there was a

16   disagreement as to what had occurred.  And after Judge Dorsey

17   heard his petition to be reinstated into the drug court

18   program, as you say, after this 30 or 40 days in jail, Judge

19   Dorsey reinstated him to the program?

20   A    Yes, sir.

21   Q    And to your knowledge, is that the first and only time

22   that Judge Dorsey has ever allowed anyone who has been

23   removed, forgetting the first instance, but the second time,

24   to come back into the drug court program?

25   A    To my knowledge, that's correct.

Michael Fosbre – Direct

1  Q    And since August of 2011, how would you characterize his

2  performance?

3  A    His performance since that time has been excellent.  We

4  have different categories when you come to drug court

5  reporting, and they are -- we have the jail reports, people

6  who we've incarcerated for one reason or another.

7       We have the jury box people, they are the people who are

8  encountering difficulties and we're going to be asking the

9  Court to sanction them.

10       And then we have the people that are placed in what's

11  called the regular category, that is that you're not doing

12  anything particularly bad, but you are not doing anything

13  particularly good.

14       And then you have the exceptional people, and the last

15  several times Mr. Mumpower has been in court, reporting in

16  drug court, he has been in the exceptional category.

17  Q    And that's the goal, is to get in the exceptional

18  category, be on the exceptional list?

19  A    Absolutely.

20  Q    And you say the jury box.  What that means is people who

21  are on the hot seat, so to speak.  They sit in the jury box,

22  and the court deals with each one individually?

23  A    That's correct.

24  Q    And when would Mr. Mumpower be scheduled to graduate and

25  have his completion of this drug court program on his current

Michael Fosbre – Direct

1  flow?

2  A    We never know the exact dates in advance, but our

3  graduations are usually in January and July.  Right now

4  Mr. Mumpower is scheduled for the next graduation, which would

5  be in July.

6  Q    Sometime in July of 2012?

7  A    Yes, sir.

8  Q    And, Mr. Fosbre, I don't know if we put you on the spot

9  or if you have your data with you today, but could you just

10 give Judge Turk some indication of the success ratio or

11 recidivism rate with this program.

12 A    I don't know number-wise.  I do know that we are very --

13 we feel we're very successful, and the reason being is that

14 when we -- you know, the question comes up:  What is success?

15 Is it success when somebody graduates from drug court and two

16 years later commits another crime?

17     If they graduate from drug court, yes, I think it's

18 success, because they came into the program with an active

19 addiction and have to have at least eight months clean time to

20 graduate; they have to be employed to graduate; they have to

21 have completed 100 hours of community service to graduate;

22 they have to pay treatment fees and supervision fees, which

23 amounts to $900, to graduate; and they need to pay their court

24 costs in full.  I believe that by fulfilling all those

25 obligations, having gone through the treatment, someone who

Michael Fosbre – Direct

1  makes it to that point is a success.

2      Some people do have problems in the future, but we have a

3  large number that don't.  And since I've been doing this job,

4  I've had more contact with people I've had in the drug court

5  program, getting back in touch with me after the drug court

6  program to tell me that they're still doing well than any

7  other type probation I've ever been involved with.

8  Q    And I believe your most recent graduation was in –- the

9  January graduation actually was in February this year?

10 A    Yes, sir, February 17th.

11 Q    And I believe there were 13 graduates?

12 A    That's correct.

13 Q    And of the 13 graduates, there were over 1300 hours of

14 community service given back to the community, all the court

15 costs and fines were paid, and all treatment –- there's an

16 additional treatment fee that's a component as well?

17 A    Yes, sir.

18 Q    And all those fines and costs were paid?

19 A    Yes, sir.

20        MR. ANDERSON:  Thank you, Mr. Fosbre.

21        THE COURT:  You may cross-examine.

22        MR. BASSFORD:  No questions, Your Honor.

23        THE COURT:  Thank you.

24     Would you call your next witness.

25        MR. ANDERSON:  Kevin Thompson.

1      KEVIN THOMPSON, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3   BY MR. ANDERSON:

4   Q    Good morning, Mr. Thompson.  Would you please identify

5   yourself for Judge Turk.

6   A    My name is Kevin Thompson.  I'm a licensed professional

7   therapist, and I work for Blue Ridge Behavioral Health Care.

8   Q    In your capacity at Blue Ridge Behavioral Health as a

9   therapist, have you had occasion to come to know Spencer

10  Mumpower?

11  A    Yes, on two separate occasions.  I actually had him in my

12  group the first time he was referred by probation for services

13  with us, and the second time when he came back about a year

14  ago.

15  Q    And how did he do on that first referral?

16  A    Not very well.  He was an angry, defiant kid.  It was

17  clear he was still using.  Our goal is rehabilitation, and it

18  was pretty obvious to us that wasn't Spencer's at the time.

19  And we lost contact with him after a few months, not knowing

20  what had happened to him.

21  Q    And then did, sometime later he had a second referral?

22  A    Yes, sir, he came back on my caseload in February of last

23  year.

24  Q    February 11th?

25  A    So he had been with me about a year.

Kevin Thompson – Direct

1  Q    Can you give the judge an indication of what he's been

2  like since February 2011?

3  A    Yeah.  In the seven years I've been there, I've probably

4  had about a thousand people on my caseload, and I can say that

5  Spencer is probably -- there's three or four people, maybe,

6  out of a hundred that come in prison the way Spencer did the

7  second time around.  It seemed to be his goal to become

8  rehabilitated for himself.  He didn't need a lot of guidance

9  for us to steer him in that direction.

10      He started to be honest about his situation, he started

11 to work on his issues, he started to connect with his peers.

12 He had some stumbling blocks sort of in the beginning, but I

13 think that was adjusting more to recovery than any kind of

14 defiance or unwillingness on his part to put in the effort.

15      We never had a positive drug screen on him during the

16 time he has been with us in the last year.  Except for the

17 time that he was incarcerated that Mr. Fosbre mentioned, he

18 didn't miss groups; he came to every group.

19      I think the thing for me that I think is most important

20 when you work with these people is he absolutely was able to

21 demonstrate -- and we got this from collateral reports, from

22 his mother and his peers -- that what he was doing in group

23 and in sessions with us he was able to translate out in the

24 world in his real life.

25      So he started to become responsible.  He held down a job,

Ginger Mumpower – Direct

1  he started going back to school, he was staying out of

2  trouble.  And he actually rose, in the time that he has been

3  with us, to be a role model for other people coming into the

4  program.

5      So there's really not a lot of people I can say I've seen

6  that big a drastic turnaround.  We have success, we do have

7  success; but this was, in my opinion, when Mr. Mumpower came

8  in, this was a guy who really committed to changing his life.

9  Q   How was he with regard to his attendance?

10 A   He is the only client that I am aware of that I have

11 worked with that had perfect attendance, other than when he

12 was incarcerated.  He was there all the time, and he was

13 active all the time, and he participated all the time.  And

14 that was from the beginning, when he first presented back in

15 February of last year.

16 Q   Thank you so much.

17         MR. ANDERSON:  That's all I have, Your Honor.

18         THE COURT:  Any cross-examination of this witness?

19         MR. BASSFORD:  No questions, Your Honor.

20         THE COURT:  Thank you.

21     Would you call your next witness.

22         MR. ANDERSON:  Ginger Mumpower.

23      GINGER MUMPOWER, DEFENDANT'S WITNESS, SWORN

24                  DIRECT EXAMINATION

25 BY MR. ANDERSON:

Ginger Mumpower - Direct

1  Q    Good morning.  Please state your name for Judge Turk,

2  please.

3  A    Ginger Mumpower.

4  Q    You are Spencer's mother?

5  A    Yes.

6  Q    If you would describe for Judge Turk in your words what

7  changes, if any, you've seen in Spencer since y'all first

8  started having to fight this horrible addiction.

9  A    I feel like I have my son back.  There were times -- he

10  was such a great kid when he was -- as a toddler, a young boy,

11  and never had discipline problems; self-starter, kind, loyal,

12  good to his friends.  And he became a person that I didn't

13  really recognize.  He became polar opposite of all the things

14  that I had tried to raise him to be.  And I feel like in the

15  last year, I've found my son back.

16  Q    Now, when did you become aware that he was messing around

17  with drugs and developing this -- what would lead to a

18  30-bag-a-day addiction?

19  A    Well, it didn't -- it's something that happened

20  gradually, but I first became aware of his drug use as I was

21  going -- or as his father and I were going through a divorce.

22  Q    And at that time, did you try to take steps, but with

23  other therapeutic communities, to help Spencer?

24  A    I did.  Spencer has been in 15 different rehabs.  I

25  wasn't really sure what to do because nobody in my family had

Ginger Mumpower - Direct

1  ever gone through drug addiction that I knew of.  And I

2  wasn't -- I wasn't aware of what resources were available.

3  And so each time that I would discover drug use, I would -- I

4  would -- I would put him in another rehab.

5      And what I didn't realize then, and it's just nothing

6  more than by ignorance of how addiction works, was I thought

7  when he came home, he came home clean and just the way he was

8  before, and I thought life would go back to normal.

9      And I think the difference -- I'm actually very, very

10  grateful for our judicial system and forever grateful for the

11  drug court program, because it's the aftercare that I learned

12  that is so important.  It's not -- all of the programs work

13  while the kids are there, but it's how they come back out that

14  makes a difference.

15  Q    And those early programs didn't have much success with

16  Spencer, did they?

17  A    Every single program was successful while he was there.

18  Once they'd get him in, get him cleaned up, he would become

19  part of their group, and I think he had a sense of belonging

20  again.  And he actually bonded with counselors, with the other

21  people there.

22      But then when he came home, it's like he was shunned and

23  embarrassed.  It was hard to be accepted back into a community

24  who was well aware of the different things that he had done.

25  And the drug court program provided fellowship and friendship

Ginger Mumpower - Direct

1 and kind of pushed him into you've got to go work and you have

2 to volunteer.  And that was the missing link over the years

3 that I had tried all the different programs.

4 Q    Let's focus now on the latter time that he's back.

5 A    Okay.

6 Q    He spent a little over ten months in the Western Regional

7 Jail here in the Roanoke Valley on a related charge?

8 A    Right.

9 Q    And he was released in February, approximately

10 February 2011?

11 A    Right.

12 Q    And has he lived with you since that time?

13 A    Yes.

14 Q    And has he given you any difficulties at all?

15 A    He doesn't clean the kitchen as much as I would like, but

16 there's -- no, he's -- he's home when he is supposed to be,

17 and the only people that he brings to my house are people that

18 he knows through one of the groups.

19     And I have an 18-year-old daughter that I'm very

20 protective of too, and I would never allow anybody in or

21 around my house that I thought was connected to drugs in any

22 way.

23 Q    If you had to describe him since returning with you

24 full-time in February 2011, while he's been in drug court,

25 while he's been on pretrial release here with this court, in

Spencer Mumpower - Direct

1  terms of the change or what you think Spencer has really had

2  time to sit down and talk with you about, what would you say

3  to Judge Turk in terms of what turnaround you've seen in your

4  son?

5  A    One of the most important things to me is he's back in

6  church with me, and I think that it's our faith that has

7  sustained us, and the realization that God spared him for a

8  reason.  And he has just went through the programs.  He wants

9  to be a drug counselor, and -- which he feels like will help

10 him with his own sobriety.  And I'm proud of him again.  I'm

11 very proud that he is -- he's always had a helpful heart, but

12 he wants to try to spare another family from going through

13 what ours has been through.

14 Q    Thank you.

15         MR. ANDERSON:  That's all the questions I have.

16         MR. BASSFORD:  No questions, Your Honor.

17         THE COURT:  Thank you.

18     Would you call your next witness.

19         MR. ANDERSON:  Spencer Mumpower.

20         SPENCER MUMPOWER, DEFENDANT'S WITNESS, SWORN

21                    DIRECT EXAMINATION

22 BY MR. ANDERSON:

23 Q    Good morning.  Please state your name for Judge Turk.

24 A    Spencer Cruise Mumpower.

25 Q    How old are you today, Spencer?

Spencer Mumpower – Direct

1  A    I'm 23.

2  Q    Now, when you were first arrested and I first met you for

3  the first time, how much did you weigh?

4  A    I weighed 135 pounds.

5  Q    And today, do you know what your current weight is?

6  A    It's 225.

7        THE COURT:  How much?

8        THE WITNESS:  225.

9        THE COURT:  225.  You're a little overweight now,

10  aren't you?

11        THE WITNESS:  Yes, sir.

12  BY MR. ANDERSON:

13  Q    That's a good feeling --

14  A    Uh-huh.

15  Q    -- given what caused your weight loss before?

16  A    Yes, sir.

17  Q    How many bags a day were you up to doing -- when I say

18  "bags," I'm talking about heroin -- at the time of your

19  arrest?

20  A    It varied day to day, of course, but it was usually

21  between 20 and 30.  I had someone who was selling at my house

22  in exchange for -- they would give me drugs, and then, you

23  know --

24  Q    Was that Ms. Frost?

25  A    Yes, sir.

Spencer Mumpower - Direct

1  Q    And even though that -- the residence where you were at

2  that time, had she essentially come in and taken over your

3  place and controlled you through the use of heroin?

4  A    Completely.  She gave me bags, when I was desperate, to

5  have my room.  I slept on a mat in the front room of the

6  house.  Every time that I would run out, the few possessions

7  that I did have, things that had been left to me through my

8  family, she would write a handwritten contract that I would

9  have to sign -- sorry.  I signed everything that I had over.

10  Q    All to get more heroin?

11  A    Yes.  On these little handwritten contracts every day.

12  Every penny I had went to it.  If it was food or water, I

13  would pick that over it.

14  Q    And I would like for you to describe for Judge Turk in

15  your own words, if you can, what it was like for you when you

16  learned that Mr. Roth had died from a heroin overdose that you

17  were involved with.

18  A    I can't even explain the words.  I collapsed.  When I

19  found out -- the same night that that happened was the same

20  night that I got arrested.  It's been 23 months ago.  And I

21  was coming off of everything in a jail cell.  When I found

22  that out, I just broke down.  It's the only thing I can say.

23  I've never -- I just didn't know how to deal with it.

24        THE COURT:  He was a friend of yours, wasn't he?

25        THE WITNESS:  In high school, yes.  I hadn't seen him

Spencer Mumpower – Direct

1  in years when he showed up.

2  BY MR. ANDERSON:

3  Q    Now, before you were arrested -- you were arrested on

4  about April of 2010, around April the 9th, I believe?

5  A    (Nods head up and down.)

6  Q    On April the 8th of 2010, you were there at your home and

7  you were being controlled by Mrs. Frost, and you had done some

8  heroin?

9  A    (Nods head up and down.)

10  Q    And did she send you on some errands to go get something

11  she needed?

12  A    Yes.

13  Q    And you learned -- you got a phone call that someone

14  there at that residence had -- was experiencing an overdose?

15  A    Yes.

16  Q    And then did you immediately run back home?

17  A    I remember it completely.  I had everything from the

18  store she wanted in my arms.  And as soon as I got the call, I

19  dropped it on the floor.  It was about a quarter mile, and I

20  ran as quick as I could.  When I got there, he was on the

21  ground, not breathing, eyes rolling back in his head.

22      I got someone to help me drag him to the bath to throw --

23  put water on him, throw ice on him.  I told Crystal, "Call the

24  cops, he will die."  And I gave him mouth to mouth until they

25  got there.

Spencer Mumpower – Direct

1  Q    Did you place this individual then into the tub or the

2  shower?

3  A    Yes.  He was in the tub when I kept giving him mouth to

4  mouth and trying to keep him going.

5  Q    And 9-1-1 was able to get rescue, and they arrived on the

6  scene?

7  A    Yes, sir.

8  Q    Along with law enforcement?

9  A    Yes, sir.

10  Q    And they were able to save this young man?

11  A    Yes, sir.

12  Q    In large part because of some of the resuscitation

13  attempts you were able to make?

14  A    Yes, sir.

15  Q    And it was that encounter that caused your arrest,

16  because they had the outstanding state warrants for you at

17  that time?

18  A    Yes, sir.

19  Q    And then a minute ago you referenced 23 months.  You went

20  into custody?

21  A    Yes, sir.

22  Q    And then 23 months later, after what you've been through,

23  we see Spencer Mumpower up today?

24  A    Yes, sir.

25  Q    225 pounds?

Spencer Mumpower - Direct

```
 1  A    Yes, sir.

 2  Q    Drug-free?

 3  A    Yes, sir.

 4  Q    You have a plan for your life?

 5  A    My plan is -- I've done a lot of wrong things through

 6  addiction.  My plan for now, which I have been doing some now

 7  the best I can, is to help other people.  I've had friends who

 8  I've tried to show them what I do, fun activities, like

 9  weight-lifting, marshal arts, taken them and shown them it can

10  be fun.  You don't sit around and be bored when you quit doing

11  drugs.  My plan is to go, through the church and the help of

12  God, to help as many people as I can to make up for what I've

13  done.

14  Q    You're attending classes at Virginia Western?

15  A    Yes, sir.

16  Q    You've tried that once before?

17  A    Yes, sir.

18  Q    Kind of like the drug treatment therapy, the first time

19  didn't go so well for you, did it?

20  A    Yes, sir, because I didn't want it then.  I was doing it

21  because it was what I was told.

22  Q    And the second time that you've been in, it's been a

23  success?

24  A    Yes, sir.

25  Q    Just like your treatment?
```

Spencer Mumpower – Direct

1  A    Yes, sir.

2  Q    Your grades have been exceptional?

3  A    Yes, sir.

4  Q    You, after these 23 months, have your life in the

5  direction you want it to be?

6  A    I do, sir, but I just want to make up for everything that

7  I've done, so I'm trying to dedicate my life to helping others

8  instead of being selfish like I was for so many years.

9  Q    And what, if anything, would you say -- this might put

10 you on the spot, I know you're not prepared for this.  But

11 what, if anything, would you say to the Roth family today, if

12 you had a chance?

13 A    There's nothing I can say to make it better, to bring him

14 back.  I'm sorry for everything that I've done and everything

15 you've had to go through.  And I can't imagine -- I can't say

16 anything to make it better, I know that, but I'm sorry.

17 Q    Spencer, is it your intention today, if allowed, do you

18 want to complete your drug court program that you've been in

19 and have your scheduled July graduation?

20 A    Yes, sir.

21 Q    Okay, Spencer, I'm proud of you.  Thank you.

22 A    Thank you, sir.

23         MR. ANDERSON:  That's all I have.

24         THE COURT:  How did you happen to get on drugs, you

25 know, at age 14?

Robin Roth – Direct

1          THE WITNESS:  When I was in high school, I never

2     really felt like I fit in.  And --

3          THE COURT:  Were you bullied?  Not really?

4          THE WITNESS:  A little bit.  I was awkward.  I wanted

5     to fit in so bad that I tried hard, and sometimes it didn't

6     work.  And by doing that, it was -- you know, it started out,

7     of course, with smaller things like smoking weed, things of

8     this sort, that made you feel accepted.  So the only thing you

9     had in common was the drug with the other people, but it was

10    something in common that gave you a reason to hang out, gave

11    me a reason to hang out with more people.

12          THE COURT:  You may cross-examine.

13          MR. BASSFORD:  No questions, Your Honor.

14          THE COURT:  Thank you.

15       Would you call your next witness.

16          MR. ANDERSON:  Your Honor, that's all the evidence we

17    have.

18          THE COURT:  Does the government have any evidence it

19    wants to put on?

20          MR. BASSFORD:  Yes, Your Honor.  We call Ms. Roth,

21    please.

22        ROBIN MATTHEWS ROTH, PLAINTIFF'S WITNESS, SWORN

23                    DIRECT EXAMINATION

24    BY MR. BASSFORD:

25    Q    Ma'am, could you tell us your name, please.

Robin Roth - Direct

1  A      Robin Matthews Roth.

2  Q      And you are the mother of Scott Roth?

3  A      Yes, I am.

4  Q      And you have some matters that you would like to share

5  with the judge or tell the judge about?

6  A      Yes, I do.

7  Q      Please go ahead.

8  A      First of all, Judge, this is my son, my only son that I

9  lost, and I just wanted to just bring him here with me today.

10        And I would like to applaud you, Spencer, for your

11  recovery, and I think that's great.  However, my son wasn't

12  given that same opportunity to complete his recovery, because

13  of your illegal actions.  So to continue your recovery at this

14  point doesn't seem quite fair to me.

15        Thank you for letting me speak today, Your Honor.

16        Spencer, I must forgive your actions; that is what my God

17  commands me to do.  I will not tarnish the memory of my

18  beautiful son, Scott Roth, because forgiveness is what I

19  taught Scott to do.

20        I do hold you accountable for your illegal actions that

21  caused the untimely death of my son, Scott.  I beg of this

22  Court to give you the maximum penalty under law for your

23  actions.  That is accountability.

24        You are a repeat offender of distributing heroin.  You

25  must have a portion of your life spent in prison as a

Robin Roth - Direct

1  consequence of your illegal actions that led to Scott's death

2  on April 8th, 2010, not because of mine and my family's hurt,

3  but because the law should command it.

4      Scott was accountable with his own life.

5      Spencer, have you ever heard a dog howl?  That is the

6  sound you can hear from my house.  That sound is deafening; it

7  comes from me.  I lost my life the day Scott died.  He was my

8  only child, my beloved son.

9      Spencer, will you be there to visit me when I'm old and

10  lonely?  Neither will Scott.

11      Spencer, will you be there to eat dinner with me, mow my

12  lawn, and wish me a happy birthday?  Neither will Scott.

13      Spencer, will you be there to hold my hand when I am sick

14  and dying?  Neither will Scott.

15      I will have no grandchildren.  Memories that should be

16  shared with my son, gone.

17      Do you know the pain that I bear when I think of my son

18  dying alone?  I was not there to hold his hand, stroke his

19  head, and tell him not to be afraid, and to say one more time,

20  "I love you, son."

21      I live with that thought of Scott dying alone every

22  second of every day.

23      Spencer, I pray that God equips you with the strength and

24  courage to turn this mess into a message for others who suffer

25  the disease of addiction.

Robin Roth - Direct

1        Take this tragedy and turn it into something good and

2   honorable for yourself, Scott, and God, because that is what

3   my son, Scott Thomas Matthews Roth, would want you to do.

4        My son is so missed by me and his family.

5        In closing, I ask this Court to acknowledge

6   accountability of Spencer Mumpower's criminal acts.  He

7   deserves, and I beg this Court to give him the maximum penalty

8   for his actions that took my son's life.

9        Thank you, Your Honor.

10  Q    Now, Ms. Roth, as we talked about earlier, Mr. Mumpower

11  did intervene and did help us in the prosecution of Crystal

12  Frost?

13  A    Yes.

14  Q    I think it's fair to say that but for his actions and his

15  cooperation with the government, we would not have been able

16  to convict her.

17  A    Yes.

18  Q    So because of that, the government owes Mr. Mumpower

19  something.

20  A    Correct.

21  Q    And the government has filed a motion for substantial

22  assistance, as you're aware, correct?

23  A    I'm sorry?

24  Q    We filed a motion for substantial assistance in this case

25  to reflect his contributions against Ms. Frost.

Robin Roth - Direct

1    A    Correct.

2    Q    And that is going to give Judge Turk, if Judge Turk

3    chooses to grant this, the authority to impose a sentence

4    without regard to the statutory 20 years.

5    A    I understand that.

6    Q    That means the judge could go anywhere from 20 years down

7    to zero years, if he felt like it.

8         Given that whole range and taking into account what

9    you've heard today, taking into account Mr. Mumpower's

10   contributions to help us prosecute Ms. Frost, what sort of

11   sentence, taking that into account, do you think that

12   Mr. Mumpower should receive?

13   A    I think it would be fair to give him 15 years, and give

14   him five years for assisting the DEA.  And his recovery, I

15   think he can continue in the environment where he can be

16   placed.  An addict is going to be recovering his whole life,

17   so he doesn't need to be recovering in Roanoke or wherever he

18   is as an ongoing process.  So I think that he needs to start

19   his sentencing now.

20   Q    Do you have anything further to say to the judge?

21   A    No.

22        Thank you, Your Honor.

23        MR. BASSFORD:  Okay.  I have no further questions of

24   this witness.

25        THE COURT:  Have you had an opportunity to speak to

Robin Roth - Direct

1    Spencer since this happened?

2            THE WITNESS:  No, sir.

3            THE COURT:  Would you like to do so?

4            THE WITNESS:  No, sir.  Not right now, sir.  No.

5            THE COURT:  I think it would help you.

6            THE WITNESS:  No.  I think I still have a lot of

7    anger still with me.

8            THE COURT:  I know you do.

9            THE WITNESS:  I still have a lot of anger, and that's

10   going to take time for me.

11           THE COURT:  It is.

12           THE WITNESS:  It's going to take time for me.

13           THE COURT:  But once you can get rid of that, you'll

14   be a better person?

15           THE WITNESS:  It's not today about me being a better

16   person.  It's about accountability, and it's about the law

17   providing the coverage, that my son is gone.  And it's not

18   about me growing as a person.  I will grow as a person.  It's

19   about accountability.  My son was accountable for the rest of

20   his life, and I think 15 years is a very short portion of a

21   young man's life, who can help people when he is in prison.

22           THE COURT:  Did you know your son was on heroin?

23           THE WITNESS:  Absolutely.

24           THE COURT:  You did?

25           THE WITNESS:  Yes, I did.  He was in recovery for

Robin Roth - Direct

1  nine months.

2          THE COURT:  How long had he been on it?

3          THE WITNESS:  Not very long; intermittently, for a

4  couple years.  But he stopped, and he was clean for nine

5  months.  He was clean for nine months before he relapsed.  And

6  the one relapse he had killed him.  So I understand all about

7  recovery and addiction.  I'm a registered nurse, and --

8          THE COURT:  An RN?

9          THE WITNESS:  Yes, sir.  And my main purpose here

10  today is just that my son made a horrible, horrible choice,

11  knowing the consequences.  And I think Spencer did the same

12  thing; he made a horrible, horrible choice, knowing the

13  consequences.  So I think fair is fair.  My son won't ever be

14  able to hold my hand --

15          THE COURT:  Certainly not.

16          THE WITNESS:  -- ever again.  My life ended the day

17  that my son died.  And I will figure out a way to go forward,

18  but this is a huge part that has to be taken care of first.

19  And in my opinion, it's about accountability.  It's not about

20  me and it's not about my anger.  I have every right, right

21  now, to be angry, and for how long will be my healing process.

22          THE COURT:  You may cross-examine.

23          MR. ANDERSON:  Thank you, Your Honor.  I have no

24  questions.

25          THE COURT:  Thank you.

U.S.A. v. Mumpower – 3/1/12

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Would you call your next witness.

3          MR. BASSFORD:  No further witnesses, Your Honor.

4          THE COURT:  All right.

5      What do you want to say in regard to the substantial

6  assistance motion?

7          MR. BASSFORD:  Your Honor, when we started this case

8  out, we knew that Mr. Mumpower --

9          THE COURT:  This is a tragic case, isn't it?

10          MR. BASSFORD:  It's a tremendously tragic case.

11          THE COURT:  For both families.

12          MR. BASSFORD:  We have two lives, one has ended and

13  one is never going to be the same again, and there's no good

14  to be had from any of it.

15      But, you know, we knew that Mr. Mumpower was involved,

16  and essentially we could prove that.  But we wanted to go

17  beyond him to find the next person who was responsible, and

18  that, of course, was Ms. Frost.

19      But in proving these overdose cases and showing the

20  distributions that led to death or serious bodily injury, it's

21  not an easy thing to do.  And it was Mr. Mumpower who gave us

22  the keys to getting to Ms. Frost.

23      He testified before the grand jury.  He also identified

24  the other people who were in the apartment that night, two

25  other folks who would have been used as witnesses.  You know,

U.S.A. v. Mumpower - 3/1/12

1   there were four people in the apartment when the sale was made

2   to Mr. Roth, and one of those was Ms. Frost, and the other

3   three were government witnesses.

4       So had she gone to trial, the government had as good a

5   likelihood of prevailing based on that as it could have had,

6   given this sort of case where you have something going on in a

7   little apartment in the middle of the night with nothing but

8   addicts and folks like that around.

9       So beyond a doubt, Judge, but for Mr. Mumpower's

10  cooperation, we would not have been able to convict Ms. Frost.

11  So the government feels that justice requires that a motion be

12  made --

13          THE COURT:  And she was the real culprit, wasn't she?

14          MR. BASSFORD:  She was the higher-level supplier.

15  She was the one who had the bulk heroin connection.  She was

16  the one who had pretty much established herself there as her

17  place to sell, in Mr. Mumpower's apartment.  She was feeding

18  his addiction.

19      She -- and Mr. Mumpower is just a classic example of

20  someone who got into using and was using more than he could

21  afford and had to go into the business of selling in order to

22  keep high.  And it's grand that, you know, he's found his way

23  back out of that, but the problem is it came at the cost of a

24  life, which is why this whole proceeding is so tragic.

25      So the government's view is that he is deserving of some

 1   credit.  We will be guided by Ms. Roth's recommendation, Your

 2   Honor.

 3           THE COURT:  What would the defense counsel like to

 4   say on behalf of the defendant?

 5           MR. ANDERSON:  Good morning, Your Honor.  If it

 6   please the Court, these are horribly tragic cases, tragic in

 7   many ways, but certainly tragic when the loss of life occurs.

 8       The empathy and sympathy that we have for the Roth family

 9   and its grieving is unquestionably on the minds of

10   Mr. Mumpower and his family daily.

11       And I have all the respect in the world for Mrs. Roth and

12   how she feels and how she presents, and clearly recognizing

13   that nothing that any of us could ever do, in this courtroom

14   or outside, would ever return the love she so desperately

15   misses and grieves for.

16       And it is the horrible --

17           THE COURT:  Well, she feels like she has lost

18   everything.

19           MR. ANDERSON:  She sure does.  And, gosh, I can only

20   imagine.  I can't imagine.

21           THE COURT:  I can't either.

22           MR. ANDERSON:  I can't imagine how it would ever get

23   any better for her or cause her to feel any different, because

24   in her world, she has, as expressed, lost everything.  And

25   that's the nature of this horrible, horrible poison and

U.S.A. v. Mumpower – 3/1/12

1   addiction that befalls these young people today.

2       And the government -- this Court has seen numerous cases

3   of late, I'm sure, and the government has prosecuted numerous

4   cases with this heroin particularly.  It has made such a huge

5   return, and I don't really know the reasons why that has

6   occurred or what the demographics of it are, other than it

7   kills.  It's deadly.  And when you make a decision to use that

8   stuff, either out of an addiction or out of some conscious

9   level of thought to do it, you expose yourself to the risk of

10  that.

11      And as the government has indicated with Mr. Mumpower's

12  case, he had become essentially the puppet of Mrs. Frost, to

13  20 to 30 bags of heroin a day.  And it was truly, I would

14  describe it, about like this microphone --

15          THE COURT:  Well, there's no question but he was on

16  the road to destruction, he was.

17          MR. ANDERSON:  There's no question about it.  And

18  nothing suggests that to me greater than how when I first saw

19  him, he was about the size of this microphone.  And you see

20  him today, he is about 225 pounds.  It's just horrible what

21  that stuff does to you.  It whittles you away and takes every

22  ounce of life out of you.

23      But the upside, and if there's any way we can lift our

24  spirits and emotion from what we have to do and what we have

25  to be in today is what I would submit is the unyielding and

U.S.A. v. Mumpower - 3/1/12

1  forgiving power of the human spirit.

2      And Spencer, I submit to His Honor, has been a testament

3  to that, particularly in the last 23 months.  He has set out

4  on a course to change his life, because he wants to change his

5  life.  He has been committed to this recovery in a way that

6  has had his counselors and his drug court people say he is

7  exemplary.  He is in fact on the exceptional list, and has

8  been on many occasions in the drug court since August of 2011.

9  He has had perfect attendance in his aftercare.

10      He has -- in his mother's words, "My son has returned.

11  He's been -- the boy that was lost from me for so long is now

12  back."  And he has cut a path, I submit, that is going to

13  allow him to one day help others.  And that's the goal he has

14  set for himself.

15      I know the Court, and I've given copies to the

16  government, has had a chance to read the letter from

17  Mrs. Anderson at Avenues to Recovery, and she's indicated what

18  an inspiration he has been to those groups there that she has

19  counseled in that community of addiction, as an example.  He

20  has been a shining light to those individuals who have had an

21  opportunity to hear his testament and his personal testimony.

22      So to the extent that we have to deal with what we have

23  to deal with today, and putting Mr. Spencer in the best

24  possible light we can, the words I say can't adequately

25  describe or depict what his actions have portrayed.  And

 1  there's nothing I can do or say that would be any better of an

 2  example of this, as I phrase it, recovering, redeeming effort

 3  that the human spirit allows us to have.

 4      He is worthy.  It's not a comparative life value.  It's

 5  not where we can say what happens brings Mr. Roth back, or an

 6  eye for an eye.  That's not what we can do in this case.  If

 7  it were, we would do anything we could to return Mr. Roth.

 8  But it is about what happens individually as, I submit,

 9  sentencings should be individualized about that particular

10  defendant, based on what is reasonable under these

11  circumstances.

12      I know this Court will exercise its discretion allowed to

13  it by the government's motion and by the factors contained

14  within 3553.  But a reasonable sentence I would submit to this

15  Court is to allow Spencer to complete his drug court

16  graduation.  If the Court feels that any additional period of

17  incarceration is needed, I'll leave that to this Court's

18  discretion, because I trust completely the reasonableness of

19  this Court's ability to be fair and equitable.

20      He has been exemplary on his probationary status.  He's

21  not since August of 2011 had anything objectionable about him

22  at all with the drug court.  And I'm not aware of any

23  violations at the federal pretrial release level.

24      But I would submit to you today that Spencer is a young

25  man that can have an effect, a positive effect on a lot of

U.S.A. v. Mumpower - 3/1/12

1   lives from here out.  And hopefully, as he said, his words, "I

2   want to do something to help repay, repay for what -- the

3   wrongs that I've done."  And I would ask the Court to give him

4   that opportunity.

5          THE COURT:  Let's see what the United States has to

6   say.

7          MR. BASSFORD:  Again, Your Honor, it's good that

8   Mr. Mumpower has gotten to the place where he is at.  In the

9   government's view, he is sincere in his desire to make amends,

10  and he certainly made amends by cooperating with the

11  government to allow us to end what Ms. Frost was doing.  But

12  the tragic thing is it took a life to get him here, and the

13  life is what makes this case so difficult.

14      You know, the Court has a wide range of options to

15  consider in terms of what sentence to impose, and that may be

16  a challenging task for the Court.

17      But, again, I think we really must consider what Ms. Roth

18  believes is appropriate.  She's heard the evidence the Court

19  has, and certainly she has weighed the loss of her son, which

20  stems directly from what Mr. Mumpower says, and based on that,

21  the government's view is 15 years is appropriate.

22          THE COURT:  Anything else you want to say,

23  Mr. Anderson?

24      MR. ANDERSON:  No, sir, Your Honor.  Thank you.

25          THE COURT:  All right, Mr. Mumpower, would you stand

U.S.A. v. Mumpower - 3/1/12

1  up with your attorneys.

2      Mr. Mumpower, at this time I want to give you an

3  opportunity to make any statements you would like to make,

4  present any additional evidence in mitigation of punishment.

5      Is there anything that you would like to tell the Court

6  at this time?

7           THE DEFENDANT:  Sir, I'm sorry for everything that

8  I've done to Scott's family.  And I just hope that from here

9  on out in my life, whenever it is, one day, regardless how

10  long it takes, I'm going to be a drug counselor, and I'm going

11  to try to give back for what I've done.  But I'm sorry to

12  Scott's family.  And that's all, sir.

13           THE COURT:  Have you made any effort to try to

14  contact the Roth family or anything like that?

15           THE DEFENDANT:  Your Honor, I wasn't sure, with the

16  Court and the case going on, if it would be appropriate, if it

17  was allowed.  If I could have and I believed it would have

18  done good, it would have helped, I would have done it in a

19  second.

20           THE COURT:  Well, Ms. Roth indicated that she is just

21  not ready to talk with you at this time.  Although I think it

22  would be a good thing, you know, for you and Ms. Roth to meet.

23  Are you willing to meet with her?

24           THE DEFENDANT:  Yes, sir, in a second I would.

25           THE COURT:  Ms. Roth, you feel like you can't at this

U.S.A. v. Mumpower - 3/1/12

1  time?

2      MS. ROTH:  Not at this time, sir, no.  Not at this

3  time.  I'm under health care difficulties right now, so I'm

4  not in the best place to have the best outcome for a meeting

5  that I would hope would have a positive outcome.  And I'm not

6  really in a physical or a mental position right now to have

7  that happen, so, no, sir, I'm not.

8      THE COURT:  What sentence did he receive in the state

9  court?

10      MR. ANDERSON:  Your Honor, he had two charges of

11  distribution of heroin.  He received five years on each

12  charge, to run consecutively, and he was given credit for the

13  ten months he had spent incarcerated.  The remaining portion

14  of the five years, a total of ten, were suspended on the

15  condition that he successfully complete the drug court

16  program.

17      THE COURT:  That he not get in trouble.

18      MR. ANDERSON:  Oh, yes, sir, not have any further

19  violations of the law.

20      THE COURT:  All right.

21    Mr. Mumpower, I've heard the evidence in the case, I've

22  gone over your plea agreement, I've gone over the

23  presentencing report.

24    There have been no objections filed to the presentencing

25  report, so the Court is adopting, basically, as its findings

U.S.A. v. Mumpower - 3/1/12

1  of fact the matters set forth in the presentencing report.

2      Under the federal advisory sentencing guidelines, I find

3  that you have a base offense level of 38.  You have an

4  adjusted offense level of 38.  And giving you three points for

5  acceptance of responsibility gives you a total offense level

6  of 35.  And you have a criminal history category of I.

7      And under the guidelines, because of the minimum

8  mandatory, there is, you know, 240 months under the guideline

9  provisions; a period of supervised release of from three years

10 to life; a fine of from 20,000 to a million; and a special

11 mandatory assessment of $100.

12     I'm mindful of the fact that the government has filed a

13 substantial assistance motion in your case, which allows the

14 Court to go below the minimum mandatory.

15     This is an extremely difficult case for the Court.  I

16 think you are just as sincere as you can be, yet, you know, we

17 all have to feel sympathy for Mrs. Roth and the loss that she

18 has suffered.

19     I'm sure you had no intention for the Roth boy to die of

20 an overdose or anything like that.  And I'm mindful of the

21 fact that you have turned your life around now.  Your mother

22 now has a son that she can be proud of, and I think that, you

23 know, that you are basically a good person and you want to

24 help.

25     The trouble is, you know, is the effect that it had --

U.S.A. v. Mumpower - 3/1/12

1   your sentence has on other people out there that are in, you

2   know, the drug business.  I don't understand the drug

3   business, but, you know, the government has declared war on

4   drugs and we've had various drug czars and so forth, but I

5   don't think they have made a dent.  The drug problem is as bad

6   today as it's ever been.

7        I want to do, you know, justice in your case.  You're a

8   young man and, you know, if you're sent off and placed in a

9   medium security institution, I just have doubts about your,

10  you know, being a young man, being able to cope with that

11  situation.

12       But I want to give you credit for the fact that once this

13  has happened, you have turned your life around, you're in

14  school, you want to complete the drug treatment program, you

15  want to be a positive effect on other people.

16       Mr. Mumpower, pursuant to the Sentencing Reform Act of

17  1984, and having considered the factors noted in 18, United

18  States Code, Section 3553(a), and having consulted the

19  advisory sentencing guidelines, and having considered the, you

20  know, evidence that you have presented, and having considered

21  the motion that the government has made for substantial

22  assistance, it's the judgment of this court that you be

23  committed to the custody of the Bureau of Prisons, to be

24  incarcerated for a term of 96 months.

25       And I'm going to recommend to the Bureau of Prisons that

U.S.A. v. Mumpower - 3/1/12

1  you be afforded the opportunity to participate in the

2  residential drug treatment program while you are incarcerated.

3  And if you successfully complete that, I think you get -- in

4  addition to, you know, your good behavior time, you get

5  10 percent off of the sentence imposed.

6       Upon release from incarceration, you'll be placed on

7  supervised release for a period of 60 months.  So you must

8  report to the probation office in the district to which you

9  are released within 72 hours of your release from the custody

10 of the Bureau of Prisons.

11      While you're on supervised release, you'll be required to

12 comply with the following mandatory conditions of supervision:

13      While you're on supervised release, you cannot commit any

14 federal, state, or local crime.

15      You cannot unlawfully possess a controlled substance.

16      You must refrain from any unlawful use of a controlled

17 substance.

18      You'll be required to submit to one drug test within 15

19 days of your release from incarceration, and at least two

20 periodic drug tests thereafter, as determined by the court and

21 your probation officer.

22      As a convicted felon, you cannot possess any firearm,

23 ammunition, any destructive device, or any other dangerous

24 weapon.

25      You'll be required to cooperate in the collection of DNA

U.S.A. v. Mumpower - 3/1/12

1  as directed by your probation officer.

2      You'll be required to comply with the other standard

3  conditions of supervised release as recommended by the

4  sentencing commission and which have been adopted by this

5  court.  And they will be explained to you in more detail by

6  the supervising officer.

7      In addition to the standard conditions of supervised

8  release, the Court is going to impose the following special

9  conditions:

10     While you're on supervised release, you'll be required to

11 reside in a residence free from where any firearms,

12 ammunition, destructive devices, or other dangerous weapons

13 are kept.

14     You'll be required to submit to such warrantless searches

15 and seizure of both your person and property as directed by

16 the probation officer, to determine whether you're in

17 possession of any firearms or any illegal controlled

18 substance.

19     There is a special mandatory assessment of $100, which is

20 due and payable immediately, and which the Court does not have

21 the authority to waive.

22     I find that you do not have the financial ability to pay

23 a fine, and I'm going to waive that in this case.

24     I also find that you do not have sufficient funds to pay

25 for the cost of your incarceration, and I'm going to waive

U.S.A. v. Mumpower - 3/1/12

1   that in your case.

2       I also make the further finding that once you are

3   released from incarceration, you will not have sufficient

4   funds to pay for the cost of your supervised release, and I'm

5   going to waive that in this instance.

6       Pursuant to the plea agreement that you worked out with

7   the United States, the Court at this time is dismissing Count

8   Two insofar as it pertains to you.

9       Where would you like for the Court to recommend that you

10  be housed to serve your sentence?  What is at Morgantown, West

11  Virginia, now?

12          THE PROBATION OFFICER:  Your Honor, there's an FCI, a

13  medium security.  There's also a camp.

14          THE COURT:  Is there a camp at Morgantown?

15          THE PROBATION OFFICER:  Yes, sir.  There's also a

16  camp at Beckley and one at Petersburg.

17          THE COURT:  Well, you know, when we had the Youth

18  Corrections Act and the Young Adult Act, I used to send them

19  all over there to Morgantown.  And I've had numerous people

20  who have attended the University of West Virginia, graduated,

21  and doing fine now.

22      But the Congress saw fit to abolish the Youth Corrections

23  Act and the Young Adult Act.  I think it was a big mistake,

24  and I've talked to several members of Congress about it, and

25  some of them didn't know they were abolishing it when it was

U.S.A. v. Mumpower - 3/1/12

1  abolished.  It was a great program, but it's gone by the

2  wayside.

3       I'm going to recommend that you be housed at the facility

4  at the camp facility at Morgantown, West Virginia.  If they

5  can't take you there, at the camp facility at Beckley; and if

6  they can't take you at either one of those, at the camp

7  facility at Petersburg.

8       And I'm going to permit you to finish the program that

9  you are now on.

10       Let's see, when do you graduate from that program?

11            THE DEFENDANT:  July 2012, Your Honor.

12            THE COURT:  Do you know what time in July?

13            MR. ANDERSON:  Your Honor, the date, they haven't set

14  the date yet.  I asked Mr. Fosbre that earlier this morning,

15  and they scheduled that date, but we don't know what that date

16  is yet.  I'll be happy to notify the Court --

17            THE COURT:  When is August the 1st?

18            THE CLERK:  What day is it on, Judge?

19            THE COURT:  Yes.  Does anybody have a calendar?

20            THE CLERK:  I do.  It's on a Wednesday.

21            THE COURT:  Does he want to report himself or does he

22  want, you know, to report to the marshal's service?

23            MR. ANDERSON:  Your Honor, if it please the Court, he

24  would like to report himself.

25            THE COURT:  All right.  I will direct that he report

U.S.A. v. Mumpower - 3/1/12

1   to the facility designated by the Bureau of Prisons to start

2   his sentence on August the 1st, 2012.

3        MR. ANDERSON:  Thank you, Your Honor.

4        THE COURT:  Now, Mr. Mumpower, in your plea agreement

5   you waived your right to appeal your sentence, and that waiver

6   is binding on you unless the sentence exceeds the statutory

7   maximum or is based on a constitutionally impermissible

8   factor.  And if you undertake to appeal despite your waiver,

9   you might lose the benefit of your plea agreement.

10       If a right of appeal does exist, a person who is unable

11   to pay for the cost of an appeal may apply for leave to appeal

12   without prepayment of such cost.

13       Any notice of an appeal must be filed within 14 days of

14   the entry of judgment, or within 14 days of any notice of an

15   appeal by the government.

16       If requested to do so, the clerk will prepare and file a

17   notice of an appeal on your behalf.

18       Is there any question you want to ask the Court about

19   what the Court has done in your case?

20       THE DEFENDANT:  No, Your Honor.  But I would like to

21   say no matter where I am, in prison or out, I'm going to help

22   people.

23       THE COURT:  Well, I think you'll have an

24   opportunity -- you see, all of this time isn't going to be

25   wasted.  You can put it to good use.

U.S.A. v. Mumpower - 3/1/12

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  I want you in a camp facility.  I don't

3  want you in a facility where the hardened criminals are.  You

4  are a young man and I think you can, you know, be a real

5  service.  And I'm not sure you could cope in a medium or

6  maximum facility.

7        THE DEFENDANT:  Yes, sir.

8        THE COURT:  But I think you're going to be all right.

9  I think you will.

10        THE DEFENDANT:  Thank you.

11        THE COURT:  And at some time or other, I hope

12  Mrs. Roth will get in touch with you and that the two of you

13  can have a meeting and discuss this thing.  I know that she

14  has a lot of anger and all now, and is not in a position to at

15  this time.  But I think if the two of you could get together

16  and sit down and exchange ideas and so forth, she would feel

17  better, and you'll feel better too, I think you will.  And I'm

18  glad that you're willing to meet with her when she feels like

19  she's in a position to do it.

20        Any other matter to come before the Court at this time?

21  If not, I'll ask the marshal to declare a short recess and

22  then we'll take up the next matter.

23        (Court recessed at 11:44 a.m.)

24

25

U.S.A. v. Mumpower – 3/1/12

```
 1
 2                              CERTIFICATE
 3   I,  Judy K. Webb, certify that the foregoing is a correct
 4   transcript from the record of proceedings in the
 5   above-entitled matter.
 6
 7   /s/  Judy K. Webb          Date:  5/22/2012
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```